**In re Arnold PECK, Debtor.**

**Bankruptcy No. 5–89–01414.**

United States Bankruptcy Court, D. Connecticut.

April 16, 1990.

Andrew M. DiPietro, Stephen P. Wright, DiPietro, Kantrovitz & Brownstein, P.C., New Haven, Conn., for debtor.

Howard L. Siegel, Scott D. Rosen, Hoberman & Pollack, P.C., Hartford, Conn., for Bank of Boston Connecticut.

John H. Krick, Greenfield, Krick & Jacobs, New Haven, Conn., for General Unsecured Creditors' Committee.

Harold S. Horwich, Hebb & Gitlin, Hartford, Conn., for Bank Steering Committee.

Honor S. Heath, New Haven, Conn., Office of the U.S. Trustee.

## MEMORANDUM AND ORDER ON OBJECTION TO DEBTOR'S AMENDED APPLICATION TO EMPLOY ATTORNEYS

ALAN H. W. SHIFF, Bankruptcy Judge.

The matter before the court is the debtor's amended application (the "Application") to employ the law firm of DiPietro, Kantrovitz & Brownstein ("DKB") *nunc pro tunc*, effective February 1, 1990, to which the Bank of Boston Connecticut ("BBC") objects. For the reasons that follow, BBC's objection is overruled and the Application is granted.[1]

---

**1.** I find that because of the size of this case and the numerous pressing matters that had to be addressed in the initial period after the order for relief entered, the failure of the debtor to

## BACKGROUND

### A.

On November 15, 1989, Citytrust, New Haven Savings Bank, and Union Trust Company filed an involuntary petition against the debtor under chapter 7 of the Bankruptcy Code. *See* 11 U.S.C. § 303(b)(1). On January 31, 1990, an order for relief entered under chapter 7, *see* 11 U.S.C. § 303(h), and on February 1, the debtor converted the case to chapter 11. *See* 11 U.S.C. § 706(a).

The debtor is a real estate developer, investor, and broker. The property of the debtor's estate consists of more than 180 pieces of commercial and residential real property in which the debtor had an interest as an individual, a general partner, a limited partner, or a shareholder. The aggregate claims against the debtor are estimated at $400,000,000.00, consisting of secured claims of $300,000,000.00 and unsecured claims, including undersecured claims, of $100,000,000.00. Claims are held by over forty banks and hundreds of individuals and businesses. Several of the banks hold claims of between $20,000,-000.00 and $35,000,000.00. It has been claimed that the failure of the debtor to reorganize will add significantly to the current instability in the Connecticut real estate market. It has also been reported that a group of thirteen banks known as the "Bank Steering Committee" is working with the debtor in an attempt to develop a consensual plan of reorganization and to avoid a forced liquidation. DKB has represented the debtor in those negotiations since the commencement of this case. On March 7, the debtor filed an application to employ DKB. On March 15, BBC filed an objection. On March 20, the debtor filed the Application.[2]

On June 16, 1987, the debtor gave BBC a $2,500,000.00 note (the "Milford note"), which was secured by a mortgage on the debtor's headquarters at 209 Boston Post Road, Milford, Connecticut. The current principal balance on the Milford note is $1,500,000.00. In July, 1987, the debtor gave BBC a second note (the "Rocky Hill note"), which was secured by a mortgage on the debtor's property known as France Street Subdivision, Rocky Hill, Connecticut. The Rocky Hill note was refinanced in June, 1989 and has a current principal balance of $2,408,851.00. DKB represented BBC in both loan transactions.

The debtor has not made payments on the Rocky Hill and Milford notes since July and August, 1989, respectively. On December 7, 1989, BBC filed motions for relief from the automatic stay to allow it to continue state court foreclosure actions which had been commenced pre-petition. *See* 11 U.S.C. § 362(d). On February 2, 1990, a stipulated order entered which, with respect to the Milford property, provided that: (1) as soon as practicable after the entry of the order, the debtor would deliver to BBC a deed in lieu of foreclosure; (2) the debtor would occupy the property until July 31, 1990 and pay a use and occupancy charge of $14,000.00 per month; (3) upon BBC's receipt of title to the property, BBC and the debtor would enter into a brokerage listing agreement naming the debtor as the listing agent and providing for a sale price of $1,890,000.00 and a five percent sales commission to the debtor; and (4) sale proceeds in excess of BBC's claim would be paid to the estate and BBC would retain the right to file a claim for a deficiency judgment. The February 2 order further provided, with respect to the Rocky Hill property, that: (1) BBC would withdraw its motion for relief from stay without prejudice and would not seek relief

---

file an application for the employment of DKB resulted from exceptional circumstances and is excusable. *See FS AirLease II, Inc. v. Simon,* 844 F.2d 99, 106–07 (3rd Cir.1988), *cert. denied,* ——, U.S. ——, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988); *650 Park Ave. Corp. v. McRae,* 836 F.2d 764, 766–67 (2d Cir.1988). It is noted that there has been no objection to the *nunc pro tunc* aspect of the Application.

2. Any differences between the Application and the original application are not relevant to BBC's objection. BBC's objection to the original application is treated as an objection to the Application.

from stay before July 31, 1990; and (2) the debtor would attempt to sell the property with net sale proceeds used to satisfy BBC's claim.

### B.

Connecticut Rules of Professional Conduct 1.9 provides:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) Represent another person in the *same or a substantially related matter* in which that person's interests are *materially adverse* to the interests of the former client unless the former client consents after consultation.... [3]

(Emphasis added).

BBC argues that there is a substantial relationship between DKB's prior representation of BBC and its current representation of the debtor:

The nexus between DKB's former representation of the Bank in connection with negotiating, documenting and closing the subject loans with Peck and DKB's current representation of Peck is so clear as to not require further elaboration.... It is axiomatic that the weaknesses and risks, if any, of the Bank's position in connection with the negotiation of the Loans were known and protected by DKB when it represented the Bank, and the resolution of open or disputed issues with respect to the Loans involved DKB's careful assessment of all of the Bank's strengths and weaknesses in connection with the Loans.

*BBC Reply Memorandum* at 8–9. BBC cites as examples of conflicts which might arise the treatment of any unsecured deficiency claim on the Milford property; its administrative claim for use and occupancy of the Milford property for the period from October 31, 1989 to January 31, 1990; any future action by the estate to avoid preferential transfers; [4] any future motion for relief from stay on the Rocky Hill property; the manner of marketing and selling the Rocky Hill property; the use of assets to pay management fees for other properties; and the granting of post-petition liens on the debtor's property, including the Rocky Hill property, in connection with borrowing.

Thus, the recurring theme in BBC's arguments is that any controversy which relates to its claims for payment will flow directly from the loan documents drafted by DKB. As a variation on that theme, BBC contends that the Application must be denied under § 327(a) because DKB has an actual conflict of interest with and a materially adverse interest to a class of creditors, namely BBC.

In response, the debtor argues that Rule 1.9(a) is not implicated because DKB's employment by BBC was limited to drafting notes and mortgages on the Milford and Rocky Hill properties, reviewing a demand letter to him which had been drafted by BBC, and attending an August, 1989 meeting of his creditors, which are unrelated to the issues that have or will arise in the administration of this case. The debtor emphasizes that he

does not attack and, in fact, admits the validity of the Bank's secured status with respect to the subject properties. Moreover, the debtor does not quarrel with the amount of the indebtedness owed to the Bank. In short, the debtor is not advancing any claim that would impede the integrity of the loan documentation prepared by DKB.

*Debtor's Memorandum* at 2. As to BBC's § 327 argument, the debtor responds that because there is nothing to suggest that

---

**3.** Rule 3(a)(1) of the District Court Rules of Civil Procedure, made applicable by Local Bankruptcy Rule 1(b), provides that "this Court recognizes the authority of the 'Rules of Professional Conduct,' as approved by the Judges of the Connecticut Superior Court as in effect on October 1, 1986, as expressing the standards of professional conduct expected of lawyers practicing in the District of Connecticut."

**4.** The allegedly preferential transfers consist of attachments placed on Peck real property within 90 days of the filing of the petition. *See* 11 U.S.C. § 547(b). No claim is made by BBC that DKB represented it in obtaining those attachments.

DKB will represent the debtor with less than its best efforts and there has been no showing that DKB possesses confidential information as a result of its prior representation of BBC which can be used to BBC's disadvantage, it is a disinterested person and has no actual conflict of interest within the meaning of §§ 327(a) and 101(13).[5]

## DISCUSSION

### A.

▓▓▓ In ruling on disqualification matters, courts in this circuit give deference to the right of a client to choose his own counsel so long as high professional standards are maintained. *Government of India v. Cook Indus., Inc.*, 569 F.2d 737, 739 (2d Cir.1978); *Huntington v. Great Western Resources, Inc.*, 655 F.Supp. 565, 571 (S.D.N.Y.1987). As the court in *Government of India* stated:

A client whose attorney is disqualified incurs a loss of time and money in being compelled to retain new counsel who in turn have to become familiar with the prior comprehensive investigation which is the core of modern complex litigation. The client moreover may lose the benefit of its longtime counsel's specialized knowledge of its operations.

*Government of India, supra*, 569 F.2d at 739. Thus, I am obliged to adopt "a restrained approach that focuses primarily on preserving the integrity of the trial process." *Armstrong v. McAlpin*, 625 F.2d 433, 444 (2d Cir.1980), *vacated*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981). *See also Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir.1989) ("Because the courts must guard against tactical use of motions to disqualify counsel, ... they are subject

to fairly strict scrutiny....."). Under that approach, an attorney should not be disqualified unless the attorney's presence will tend to taint the case. *Board of Ed. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979); *United States Football League v. National Football League*, 605 F.Supp. 1448, 1452 (S.D.N.Y.1985). Two situations have been identified in which an attorney's presence will taint the case: (1) when the attorney's concurrent representation of parties with adverse interests calls into question the vigorousness of the representation of one of the clients; and (2) when the attorney's successive representation of clients with adverse interests raises the danger that he or she will use confidences gained in the prior representation in the present case. *Grand Jury Subpoena of Ford v. United States*, 756 F.2d 249, 254 (2d Cir.1985); *Nyquist, supra*, 590 F.2d at 1246; *United States Football League, supra*, 605 F.Supp. at 1452. Rule 1.9(a), which addresses successive representation, is intended to prevent a former client's confidential disclosures from being used against the client in future transactions or litigation, *In re Corn Derivatives Antitrust Litigation*, 748 F.2d 157, 162 (3rd Cir.1984), *cert. denied*, 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985), and that appears to be the focus of BBC's objection.[6]

Where a disqualification motion is based on the necessity of preserving client confidences, the Second Circuit has enunciated a three prong test:

[A]n attorney may be disqualified from representing a client in a particular case if

(1) the moving party is a former client of the adverse party's counsel;

(2) there is a substantial relationship between the subject matter of the

---

5. The debtor advances a number of supplemental arguments which are not addressed because of my conclusion that there is no conflict of interest under Rule 1.9(a) or § 327(a).

6. A second purpose of Rule 1.9(a) is to maintain public confidence in the integrity of the bar. *In re Corn Derivatives, supra*, 748 F.2d at 162. However, in this Circuit the mere appearance of impropriety is not alone a sufficient basis for granting a disqualification motion. *Board of Ed. v. Nyquist*, 590 F.2d 1241, 1247 (2d Cir.

1979); *United States Football League v. National Football League*, 605 F.Supp. 1448, 1452 (S.D.N. Y.1985). The third purpose of Rule 1.9(a) is to protect a client's expectation of "the loyalty of his attorney *in the matter for which he is retained.*" *In re Corn Derivatives, supra*, 748 F.2d at 162 (emphasis added). This last purpose appears to bring the focus back to the first purpose of the Rule, *i.e.* whether the matters are substantially related.

counsel's prior representation of the moving party and the issues in the present lawsuit; and

(3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir.1983). *See also United States v. DiTommaso*, 817 F.2d 201, 219 (2d Cir. 1987). The second prong of that test has been refined to allow disqualification

only upon a showing that the relationship between issues in the prior and present cases is patently clear. Put more specifically, disqualification has been granted or approved recently only when the issues involved have been "identical" or "essentially the same".

*Government of India, supra*, 569 F.2d at 740 (citations omitted). To satisfy the third prong, it must be shown that the attorney was in a position to receive relevant information the former client might reasonably have assumed would be withheld from the present client. *Allegaert v. Perot*, 565 F.2d 246, 250 (2d Cir.1977); *Dinger v. Gulino*, 661 F.Supp. 438, 444–45 (E.D.N.Y. 1987).[7] The *Evans* court also held that a party seeking to disqualify an attorney carries a heavy burden and must meet a high standard of proof. *Evans, supra*, 715 F.2d at 791; *Government of India, supra*, 569 F.2d at 739; *Paretti v. Cavalier Label Co., Inc.*, 722 F.Supp. 985, 987 (S.D.N.Y. 1989). "Mere speculation will not suffice." *Paretti, supra*, 722 F.Supp. at 987. *See also International Union, UAW v. National Caucus of Labor Comm.*, 466 F.Supp. 564, 570 (S.D.N.Y.1979), *aff'd*, 607 F.2d 996 (2d Cir.1979), *cert. denied*, 444 U.S. 839, 100 S.Ct. 77, 62 L.Ed.2d 51 (1979).

■ BBC argues that the potential conflicts are too numerous to mention but then gives specific examples. I cannot evaluate the merits of an argument that relies upon vague generalities, but, as to its identified concerns, the specified examples do not demonstrate a relationship between DKB's successive representations.

The scope of the BBC representation was confined to the preparation of loan documents, the closing of the two loans in 1987, and the refinancing of the Rocky Hill loan in May, 1989. No issue arising out of those tasks overlap with the issues that are or are likely to be presented in the administration of this case. For example, with respect to the Milford note, BBC will either have no claim or a deficiency claim after the Milford property is sold. If there is no deficiency, there obviously will be no disputed issue with respect to the Milford note. If there is a deficiency, BBC will have an unsecured claim in a liquidated amount, which will be allowed pursuant to the February 2, 1990 order. Any issue regarding the treatment of a BBC unsecured deficiency claim in a debtor proposed plan, such as the amount of distribution to unsecured creditors, would be totally unrelated to the documentation, any negotiations, and the closing of the Milford loan.[8] It has been suggested that a dispute may arise during the marketing of the Milford property as to its fair market value. But, even that scenario does not establish a conflict of interest because, assuming value had been an issue in 1987 when the loan was made and that DKB received some confidential information from BBC,

---

7. BBC cites *Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562 (2d Cir.1973), for the proposition that there is a presumption that the former client gave confidential information to the attorney. That court held that "where 'it can reasonably be said that in the course of the former representation the attorney *might* have acquired information related to the subject matter of his subsequent representation,' ... it is the court's duty to order the attorney disqualified." *Id.* at 571 (quoting *T.C. Theatre Corp. v. Warner Bros. Pictures*, 113 F.Supp. 265, 269 (S.D.N.Y.1953). As later cases make clear, the former client is obligated to identify some type of information

which might have been obtained in the previous representation which is related to the subsequent representation.

8. If BBC has a deficiency claim arising out of the transfer of the Milford property, under the February 2, 1990 order it would be a part of an unsecured class. Any conflicts arising out of the acceptance or rejection by that class or any other confirmation related issue would be between the members of that class. *See* 11 U.S.C. §§ 1126, 1129(a)(8), (b)(2)(B)(i), (ii).

any such information will have little if any bearing on the valuation of the property at the time of any future hearing on that dispute. A possible conflict over the appropriate amount of use and occupancy may arise, but it is inconceivable that the types of issues which would be relevant in such a dispute, *e.g.*, the amount of space occupied by the debtor and the value of that space to the debtor, were considered when the loans were made. Similarly, there is no relationship between any future preference litigation and the work DKB did in connection with the loan; DKB played no role in obtaining the alleged preferential attachments.

The foregoing analysis applies to any issue that may arise as to the Rocky Hill property, *e.g.*, its value, appropriate sale procedures, and the treatment of any deficiency claim. BBC's concern that DKB might attempt to prime BBC's lien on the Rocky Hill property as an inducement to a post-petition lender is likewise without merit. Apart from the fact that any such effort would not be substantially related to DKB's prior employment, BBC would as a matter of law be entitled to adequate protection of its security interest. *See* 11 U.S.C. § 364(d)(2).

In light of the debtor's explicit statement that he will not challenge the validity of BBC's mortgages, it is patently clear that the scope of DKB's representation of BBC is not substantially related to the subject matter of this case and that therefore BBC has failed to satisfy the second prong of the *Evans* test. While *conflicts* may arise between BBC and the debtor over issues like the value of the properties, it has not been demonstrated that any *conflict of interest* will arise as a result of DKB's representation of BBC.

Further, I find that BBC has failed to meet its burden under the third prong of the *Evans* test. Other than vague statements about the strengths and weaknesses of BBC's mortgages, which as noted are not at issue, BBC has not identified any example of any relevant information which might have been confidentially disclosed to DKB. Indeed, in the absence of a challenge to the validity of BBC's mortgages, it is difficult to imagine that DKB is in possession of any such information.

Balanced against BBC's speculitve argument that there is an actual and a potential conflict of interest is the likelihood that the estate will suffer a significant setback if BBC's objection to the Application is sustained, notwithstanding BBC's argument to the contrary. DKB has spent months familiarizing itself with the many entities and properties in which the debtor had an interest, and it is likely it would take replacement counsel a significant period of time, to so say nothing of expense, before it could render effective services. Moreover, a significant delay might be fatal to the debtor's prospects for an effective reorganization.

**B.**

█ Code § 327(a) provides:

Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

Code § 101(13) provides in part:

"disinterested person" means person that—

. . . .

(E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, . . . or for any other reason . . . .

"The disinterested person and adverse interest tests for employment of professional persons under § 327(a) overlap in that the § 101(13) definition of 'disinterested person' includes a person that does not have an interest materially adverse to the interest of the estate." *In re Intech Capital Corp.*, 87 B.R. 232, 233 (Bankr.D.Conn. 1988). That single hallmark requires the

court to inquire whether DKB has some incentive to act contrary to the best interests of the estate and its creditors. *In re Martin*, 817 F.2d 175, 180 (1st Cir.1987). I conclude that it does not.

As discussed, BBC objects on two grounds under § 327(a). First, BBC contends that DKB has a materially adverse interest to a class of creditors, namely BBC. But, since the debtor will not challenge the validity of BBC's mortgages, there is no materially adverse interest which arises out of DKB's representation of BBC in connection with the loans. With respect to the anticipated avoidance of the allegedly preferential transfers, an attorney cannot be disqualified for doing what the Code allows, *see* 11 U.S.C. § 547(b), unless a prior relationship with the transferee creates a conflict of interest. As noted, there is no such relationship here.

 Second, relying on *Steinberg v. Morton (In re Buchanan)*, 25 B.R. 162 (Bankr.E.D.Tenn.1987), BBC appears to ask this court to adopt a *per se* rule that "a firm [can] ... not represent the debtor where it had previously represented a creditor, where litigation between the debtor and the creditor was likely, and where the firm may have acquired information which might be consciously or unconsciously used to the disadvantage of the former client." *BBC Memorandum* at 17. Parenthetically, it is observed that the application of *per se* rules in making determinations under § 327(a) is not appropriate. *See In re Martin, supra,* 817 F.2d at 183. More important, BBC has failed to mention that the *Steinberg* court held that disqualification is appropriate "if a *substantial relationship* exists between the matters involved in the former representation of a client and those in a pending suit in which the interest of a second client is adverse to that of the first client." *Steinberg, supra,* 25 B.R. at 168 (emphasis added). Again, it is noted that that relationship does not exist.

BBC's objection under § 327(a) amounts to mere speculation that some actual conflict of interest may arise. That is not an adequate basis for the disqualification of DKB. *In re Stamford Color Pho-*

*to, Inc.,* 98 B.R. 135, 138 (Bankr.D.Conn. 1989) ("[M]erely hypothesizing that conflicts may arise is not a sufficient basis to warrant the disqualification of [an attorney] ... ."). *See also In re Martin, supra,* 817 F.2d at 183 ("[H]orrible imaginings alone cannot be allowed to carry the day. Not every conceivable conflict must result in sending counsel away to lick his wounds.").

## CONCLUSION

BBC's objection to the Application is overruled, the Application is granted, and IT IS SO ORDERED.